**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

FIRST GUARANTY BANK                          CIVIL ACTION NO.  23-683

VERSUS                                       JUDGE DONALD E. WALTER

JONATHAN M. LARMORE ET AL.                   MAGISTRATE JUDGE HORNSBY

## MEMORANDUM RULING

Before the Court is a "Motion to Authorize State Court Lawsuit" filed by Naperville Investors LLC, seeking authority to pursue claims for the return of its earnest money deposit in Illinois state court against the court-appointed receiver, Trigild, Inc. ("Trigild"). Record Document 140. Plaintiff, First Guaranty Bank, filed an opposition, and Naperville Investors LLC replied. See Record Documents 155 and 159. Based on the following, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

This action arises from First Guaranty Bank's enforcement of five commercial loans it made to Defendant, Jonathan Larmore. See Record Document 1. Those loans were secured by mortgages against six shopping centers, four in Illinois, one in Minnesota, and one in Kentucky. See id. On May 23, 2023, First Guaranty Bank filed an "Ex Parte Emergency Consent Motion for Appointment of a Receiver." Record Document 6. On July 5, 2023, the Court entered a "Corrected Receivership Order" (the "Receivership Order") to correct the name of the defendants[1] that owned each respective property. Record Document 21.

---

[1] Jonathan M. Larmore is named as a defendant in this matter. The remaining defendants are "juridical persons whose legal and beneficial ownership is held in full by one or more of the following: Jonathan M. Larmore, a domiciliary of Arizona; Michelle Larmore, a domiciliary of

Through the Receivership Order, the Court named Trigild as receiver of the properties (the "Receivership Estate"). See id. at 2. The Receivership Order authorized Trigild to "take any and all actions [it] deems reasonable and appropriate to preserve, secure, manage, maintain and safeguard" the mortgagors' interests in the properties, and to "market and, upon further Court order, sell the [properties] to the extent permitted by applicable law." Id. at 2, 4. The Receivership Estate was originally comprised of the six shopping centers located in Illinois, Minnesota, and Kentucky. See Record Documents 1 and 21. This motion concerns only the mortgaged property located in Naperville, Illinois ("Wheatland Naperville Property"). See Record Document 140-1 at 5.

A T Wheatland Naperville, IL, LLC ("Wheatland LLC") is the borrower and mortgagor for the Wheatland Naperville Property. See Record Document 1 at 4-6. On February 5, 2024, the Clerk of Court for the Western District of Louisiana entered a default against Wheatland LLC. See Record Document 84. Then, First Guaranty Bank moved for partial summary judgment against Wheatland LLC. See Record Document 73. This Court granted First Guaranty Bank's motion for partial summary judgment against Wheatland LLC, awarding a money judgment to First Guaranty Bank for $6,914,161.45 plus interest and attorney fees. See Record Document 94 at 4-5. The order further stated the debt was secured by two mortgages[2], an assignment of rents[3], and other security

---

Arizona; Robert H. Larmore (deceased), a domiciliary of Indiana; and Marcia Moynahan Larmore, a domiciliary of Indiana." Record Document 1 at 2.

[2] The first mortgage was executed by Wheatland LLC to First Guaranty Bank on March 31, 2021, and duly recorded with the Will County, Illinois Recorder on May 6, 2021, as Document #R2021051298. See Record Document 73-4. The second mortgage is the "Open-End Mortgage, Assignment of Rents, Security Agreement and Fixture Filing" executed by Wheatland LLC to First Guaranty Bank and duly recorded with the Will County, Illinois Recorder on October 7, 2022, as Document #R2022073920. Record Document 73-6.

[3] The Assignment of Rents was executed by Wheatland LLC to First Guaranty Bank and duly recorded with the Will County, Illinois Recorder on May 6, 2021, as Document #R2021051299. See Record Document 73-5.

instruments in favor of First Guaranty Bank. See id. at 2-3. Additionally, the order specified that those instruments were "valid and enforceable." Id. at 2.

On November 18, 2024, in accordance with the Receivership Order, Trigild listed the Wheatland Naperville Property for sale on an auction platform known as "Ten X." Record Document 140-4 at 2. Naperville Investors LLC submitted the winning bid of $13,675,000. See id. at 13. On November 20, 2024, Trigild and Naperville Investors LLC entered into a Purchase and Sale Agreement ("the PSA"). See id. at 6-66.

## I.    Material Terms of the PSA.

The PSA included certain provisions material to this motion. The PSA referenced the Receivership Order and explicitly stated that the sale of the Wheatland Naperville Property is subject to approval by this Court, as the receivership court. See id. at 13, 31. The parties agreed that the "laws of the State of Illinois (without regard to conflicts of law) shall govern the validity, construction, enforcement and interpretation of this Agreement." Id. at 26. Additionally, the PSA provided that the parties submit to the jurisdiction of this Court, as the receivership court, in respect to any suit or other proceeding brought in connection with or arising out of the PSA. See id. at 13, 30.

As for the material terms related to Trigild's performance, Trigild agreed to provide clear title to the Wheatland Naperville Property by special warranty deed subject only to "Acceptable Encumbrances," defined in Section 1.1(a) to include standard title exceptions, applicable laws, utility easements, existing surveys, and non-monetary encumbrances that did not materially impair the operation or use of the property. Id. at 10. Additionally, Trigild agreed to supply an affidavit stating "[t]here have been no improvements, alterations or repairs to the [Wheatland Naperville] Property authorized by [Trigild] for which the costs thereof remain unpaid; there are no

3

construction, materialmen's or laborers liens against the [Wheatland Naperville] Property arising through work performed by or for [Trigild]." Id. at 43. Furthermore, Trigild agreed to transfer tenants' security deposits and to prorate all taxes, rents, and utilities to the date of closing, provided that Trigild would be credited with accounts receivable dated sixty days or less. See id. at 15-16, 20.

As for the material terms related to Naperville Investors LLC's performance, it was required to pay an earnest money deposit, equal to ten percent of the purchase price, to be held in escrow by a third-party escrow agent. See id. at 11. The earnest money deposit was immediately non-refundable upon payment by Naperville Investors LLC except under the limited circumstances described in Section 8.2. See id. at 11, 21-22. Section 8.2 provides that the return of the earnest money shall be Naperville Investors LLC's "sole and exclusive remedy" if the sale does not close due to (i) the default of Trigild; (ii) an order from the receivership court or another court of competent jurisdiction prohibiting closing; or (iii) failure of the receivership court to issue the sale approval order. See id. at 21-22.

As required by the PSA, Naperville Investors LLC made an earnest money deposit of $1,000,000. See Record Document 140-20 at 2. On December 16, 2024, Trigild moved for an order authorizing consummation of sale of the Wheatland Naperville Property to Naperville Investors LLC, which this Court, the receivership court, granted on December 17, 2024. See Record Documents 127 and 129. The PSA set the closing for thirty days following the order approving sale. See Record Document 140-4 at 11. Prior to closing, Naperville Investors LLC requested that each tenant provide an estoppel certificate.[4] See Record Document 140-20 at 2. Naperville

---

[4] An estoppel certificate is "[a] signed statement by a party such as a tenant or mortgagee certifying for another's benefit that certain facts are correct, as that a lease exists, that there are no defaults, and that rent is paid to a certain date." Black's Law Dictionary 591 (8th ed. 2004).

Investors LLC alleges that as a condition to its loan for the purchase of the Wheatland Naperville Property, its lender required that each tenant provide an estoppel certificate. See Record Document 140-20 at 2. On January 9, 2025, one week before the closing date, Naperville Investors LLC requested that Trigild extend the closing pending receipt of the completed estoppel certificates. See Record Document 140-8 at 2-3. Naperville Investors LLC alleges that Trigild refused to continue the closing, stating "[t]here is no condition [in the PSA] to close related to obtaining estoppels" and demanded that the closing occur on January 16 without the estoppel certificates. Record Document 140-9 at 2.

## II.    Illinois Lawsuit.

On the scheduled closing date of January 16, 2025, Naperville Investors LLC filed suit in Will County, Illinois, seeking the recovery of its earnest money deposit. See Record Document 140-14. Naperville Investors LLC argues that it is entitled to recission and the return of its earnest money based on Trigild's (1) misrepresentations during the bidding process and (2) failure to disclose numerous material tenant disputes. See id. at 16-17. Alternatively, Naperville Investors LLC alleges that Trigild breached the PSA and is entitled to the return of its earnest money based on Trigild's (1) failure to deliver clear title and (2) breach of its implied duty of good faith and fair dealing by impeding Naperville Investors LLC's financing. See id. at 17-19. Furthermore, Naperville Investors LLC contends that the personal jurisdiction clause in the PSA is non-exclusive, and both personal jurisdiction and venue in the Will County, Illinois court are proper. See Record Document 140-1 at 16.

Relying on the Barton[5] doctrine, Trigild moved to dismiss the action brought by Naperville Investors LLC based on its failure to obtain leave from this Court before pursuing claims against

---

[5] Barton v. Barbour, 104 U.S. 126, 127 (1881).

5

Trigild in Illinois state court. Therefore, Naperville Investors LLC filed the instant motion, requesting either leave to continue the state action with nunc pro tunc authority from this Court or an order authorizing a new case in Illinois to recover the deposit.

## LAW AND ANALYSIS

### I. Barton Doctrine.

The Barton doctrine generally requires that a party seeking to sue a receiver must obtain leave from the court that appointed the receiver. See Barton v. Barbour, 104 U.S. 126, 127 (1881); see also Carroll v. Abide, 788 F.3d 502, 505 (5th Cir. 2015). The doctrine serves multiple purposes, including preserving the limited assets of the receivership estate; protecting the receiver, who is an officer of the court that appoints him, in the performance of official duties; and enabling receivership courts to maintain control over the administration of estates. See Randazzo v. Babin, No. 15-4943, 2016 WL 4418969, at *1-2 (E.D. La. Aug. 18, 2016). "An action against a receiver without court permission, the [Barton] Court reasoned, is an attempt 'to obtain some advantage over the other claimants upon the assets in the receiver's hands.'" Carroll, 788 F.3d at 505 (quoting Barton, 104 U.S. at 128). "If such a suit were allowed, 'the court which appointed the receiver and was administering the trust assets would be impotent to restrain him.'" Id. (quoting Barton, 104 U.S. at 128). The Barton doctrine therefore deprives courts of subject-matter jurisdiction. Id.

However, the Barton doctrine is subject to two exceptions. First, the business exception is statutory in nature and generally applies when a receiver or trustee is operating a business from which a stranger to the bankruptcy process is harmed, such as a negligence claim in a slip and fall case. See 28 U.S.C. § 959(a); see also In re Ondova Ltd. Co., No. 09-34784, 2017 WL 477776, at *10 (Bankr. N.D. Tex. Feb. 1, 2017). Second, the "ultra vires" exception generally excludes actions

"if they are 'outside the scope of [the person's official] duties.'" In re Foster, No. 22-10310, 2023 WL 20872, at *5 (5th Cir. Jan. 3, 2023). Neither exception applies here.[6]

It is undisputed that Naperville Investors LLC did not obtain leave from this Court before pursuing claims against Trigild in Illinois state court. See Record Document 140-15 at 9. In its complaint, Naperville Investors LLC requested the Illinois state court to enter an order rescinding the PSA with Trigild and compelling Trigild to cause the escrow agent to release Naperville Investors LLC's earnest money deposit of $1,000,000. See Record Document 140-14 at 16. Therefore, the Court finds the lawsuit constitutes an action against a receiver for acts committed in his official capacity. The Barton doctrine requires that Naperville Investors LLC obtain leave from this Court, as the receivership court, before prosecuting the claim. Naperville Investors LLC's failure to do so demands dismissal without prejudice of the Illinois state court lawsuit for want of subject matter jurisdiction. See Randazzo, 2016 WL 4418969, at *1-2.

## II. Retroactive Relief Post-Acevedo.

Naperville Investors LLC requests this Court to allow the state court litigation to proceed nunc pro tunc because the earnest money deposit is not part of the estate and this type of lawsuit is consistent with the purpose of the Barton doctrine. See Record Document 140 at 1. Federal courts may issue nunc pro tunc orders (or "now and then" orders) to "reflect the reality of what

---

[6] The business exception is limited and not applicable here. See In re Lehal Realty Assocs., 101 F.3d 272, 276 (2d Cir. 1996) (holding that Section 959 does not apply when a receiver or "trustee perform[s] administrative tasks necessarily incident to the consolidation, preservation, and liquidation of assets in the debtor's estate."); In re DeLorean Motor Co., 991 F.2d 1236, 1241 (6th Cir. 1993) ("Merely collecting, taking steps to preserve, and/or holding assets, as well as other aspects of administering and liquidating the estate, do not constitute 'carrying on business' as that term has been judicially interpreted."). Additionally, the ultra vires exception is not applicable here because there is no allegation that Trigild wrongfully seized any property. See generally Record Document 140-14. Based on Naperville Investors LLC's complaint, the earnest money deposit is presumed to be held by the escrow agent. See id. at 16.

has already occurred." <u>Roman Cath. Archdiocese of San Juan, P. R. v. Acevedo Feliciano</u>, 589 U.S. 57, 65, 140 S. Ct. 696, 700-01 (2020). <u>Nunc pro tunc</u> orders presuppose that a court has issued a ruling that was not entered only because of a court's "inadvertence." <u>Id.</u> According to the Supreme Court, nunc <u>pro tunc</u> orders are not an "Orwellian vehicle for revisionist history—creating facts that never occurred in fact." <u>Id.</u> at 65, 140 S. Ct. at 701.

Following <u>Acevedo</u>, courts have refrained from issuing <u>nunc pro tunc</u> orders when such relief would remedy a jurisdictional deficiency. <u>See</u> <u>In re Coleman</u>, 655 B.R. 441, 451-52 (Bankr. N.D. Miss. 2023) ("[I]t is also clear to this Court that the Supreme Court's decision is foremost jurisdictional: <u>nunc pro tunc</u> orders cannot be used to cure jurisdictional defects."); <u>In re Golesis</u>, 659 B.R. 767, 776 (Bankr. D. Utah 2024) ("The central holding of <u>Acevedo</u> is that a <u>nunc pro tunc</u> order cannot cure a jurisdictional defect."); <u>In re Mallinckrodt plc</u>, No. 20-12522, 2022 WL 906451, at *8 (D. Del. Mar. 28, 2022) ("<u>Acevedo</u>'s limited discussion of <u>nunc pro tunc</u> orders is best understood as specific to jurisdiction."). The <u>Barton</u> doctrine required that Naperville Investors LLC obtain leave from this Court before prosecuting the claim in Illinois state court. The failure to obtain leave from the receivership court deprives the non-appointing court of subject matter jurisdiction that it might otherwise have. <u>See</u> <u>Equip. Leasing, L.L.C. v. Three Deuces, Inc.</u>, 2011 WL 6141443, at *3 (E.D. La. Dec. 9, 2011). Because Naperville Investors LLC failed to obtain leave, the Illinois state court lacks subject matter jurisdiction over the claim, and this Court cannot cure a jurisdictional defect <u>nunc pro tunc</u>. Therefore, Naperville Investors LLC's motion is denied to the extent that it seeks relief <u>nunc pro tunc</u>.

## III.  <u>Request to Refile.</u>

In the alternative, Naperville Investors LLC "seeks an order authorizing a new case in Illinois to recover the deposit." Record Document 140-1 at 6. Under the <u>Barton</u> doctrine, a party

seeking leave to sue a receiver in another forum must establish its claim "is not without foundation." In re Vistacare Grp., LLC, 678 F.3d 218, 232 (3d Cir. 2012) (quoting In re Nat'l Molding Co., 230 F.2d 69, 71 (3d Cir. 1956)); also see Anderson v. United States, 520 F.2d 1027, 1029 (5th Cir. 1975) (holding "that while permission to prosecute an action against a trustee can involve discretion, such permission ordinarily should be granted unless it is clear that the claim is without foundation"). The "not without foundation" standard is similar to the standard courts employ when evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) but involves greater flexibility. See In re Vistacare Grp., LLC, 678 F.3d at 233; In re Highland Cap. Mgmt., No. 19-34054, 2023 WL 5523949, *40 (Bankr. N.D. Tex. Aug. 25, 2023). Courts implement this heightened pleading standard because the receivership court, given its familiarity with the underlying facts and the parties, is uniquely situated to determine whether a claim against the receiver has merit and the potential effect of a judgment against the receivership estate. See id.

To satisfy the prima facie case standard, "the movant must do more than meet the liberal notice-pleading requirements of Rule 8." In re Highland Cap. Mgmt., 2023 WL 5523949, *40 (quoting In re World Mktg. Chi., LLC, 584 B.R. 737, 743 (Bankr. N.D. Ill. 2018)). If the receivership court relied on "mere notice-pleading standards rather than evaluating the merits of the allegations, the leave requirement would become meaningless." Id. (quoting In re Kids Creek Partners, L.P., No. 004076, 2000 WL 1761020, at *2 (N.D. Ill. Nov. 30, 2000)). To apply a less stringent standard would eviscerate the protections of the Receivership Order issued by this Court. See id. ("This court agrees with the notion, that '[t]o apply a less stringent standard would eviscerate the protections' of the Gatekeeper Provision and Gatekeeper Orders"). First, Naperville Investors LLC contends that it is entitled to the return of its earnest money because Trigild breached the PSA by (1) failing to deliver clear title and (2) impeding Naperville Investors LLC's

9

financing. See Record Document 140-1 at 22-27. Additionally, Naperville Investors LLC argues that it is entitled to recission and the return of its earnest money based on Trigild's (1) misrepresentations during the bidding process and (2) failure to disclose numerous material tenant disputes. See id. at 28-29. This Court must analyze the allegations to determine whether Naperville Investors LLC meets the Barton standard.

## A. **Breach of Contract.**

Illinois state law governs the validity, construction, enforcement and interpretation of the PSA. See Record Document 140-4 at 26. "In construing a contract, the primary objective is to give effect to the intention of the parties." Thompson v. Gordon, 241 Ill. 2d 428, 441 (2001). If the provisions of a contract are unambiguous, we ascertain the parties' intent from the language chosen in the contract. See id. However, if the contract language is ambiguous, a court can consider extrinsic evidence to determine the parties' intent. See id. "A contract is ambiguous if it can reasonably be interpreted as having more than one meaning or its language is indefinite in expression." George St. Acquisitions, LLC v. Parikh Fam. Cos., 2024 Ill.App.2d 230096-U, ¶ 69 (internal citations omitted). The determination of whether a contract is ambiguous is a question of law for a court to decide. See Meyer v. Marilyn Miglin, Inc., 273 Ill.App.3d 882, 888 (1995).

### i. **Failure to Deliver Clear Title.**

Naperville Investors LLC alleges that Trigild breached the PSA and is entitled to the return of its earnest money based on Trigild's failure to deliver clear title. See Record Document 140-1 at 14. Trigild agreed to provide clear title to the Wheatland Naperville Property by special warranty deed subject only to "Acceptable Encumbrances," as defined *supra*. Record Document 140-4 at 10. Additionally, Trigild agreed to supply an affidavit stating "[t]here have been no improvements, alterations or repairs to the [Wheatland Naperville] Property authorized by [Trigild] for which the

costs thereof remain unpaid; there are no construction, materialmen's or laborers liens against the [Wheatland Naperville] Property arising through work performed by or for [Trigild]." Id. at 43.

Naperville Investors LLC contends that Trigild was unable to make such affirmations and never delivered a signed affidavit due to alleged work performed by tenants and the existence of potential unrecorded lien claims. See Record Document 140-1 at 14. Trigild counters that Naperville Investors LLC never made any title objection based on these supposed title issues prior to closing and therefore never gave Trigild the five (5) day cure period required pursuant to Section 8.2[7] of the PSA. See Record Document 155-9 at 6. Naperville Investors LLC counters that Trigild received notice of the title objections through the lawsuit filed on January 16, 2025. See Record Document 159 at 6.

The Court is unpersuaded by Naperville Investors LLC's argument that the filing of the Illinois lawsuit put Trigild on notice of the title objections. The PSA expressly requires that, in the event of a default, Naperville Investors LLC must serve written notice upon Trigild and allow Trigild a minimum of five calendar days to cure such objection or default. See Record Document 140-4 at 24. However, the contract language of "written notice" is ambiguous. See George St.

---

[7] Section 8.2 provides,

> If this transaction shall not be closed pursuant to this Agreement because of (i) default of [Trigild] . . . then [Naperville Investors LLC] may, as its sole and exclusive remedy, by serving a written notice upon [Trigild] and allowing [Trigild] a minimum of five (5) calendar days in which to cure such objection or default, obtain a refund of the Earnest Money Deposit on demand, and, after repayment of the Earnest Money Deposit to [Naperville Investors LLC], this Agreement shall be null and void and neither [Trigild] nor [Naperville Investors LLC] shall have any further rights or obligations hereunder except as to the provisions hereof which survive termination. The return of the Earnest Money Deposit shall be [Naperville Investors LLC]'s sole and exclusive remedy, and in no event shall [Naperville Investors LLC] be entitled to damages, including but not limited to punitive damages, consequential damages, incidental damages, and any and all other manner of damages, whether founded in law or in equity.

Record Document 140-4 at 24-25.

11

Acquisitions, 2024 Ill.App.2d 230096-U, at ¶ 69 ("A contract is ambiguous if it can reasonably be interpreted as having more than one meaning or its language is indefinite in expression."). Therefore, the Court must ascertain the parties' intent from the language chosen in the contract. See Thompson, 241 Ill. 2d at 441.

The PSA expressly states that the Wheatland Naperville Property, Naperville Investors LLC, and Trigild are subject to the terms of the Receivership Order. See Record Document 140-4 at 12-13. The Receivership Order expressly stated that "[n]o person or entity may file suit against [Trigild], in his capacity as Receiver, unless otherwise authorized in advance by this Court." Record Document 21 at 8. Even if the Court considered the filing of a lawsuit as putting Trigild on notice, the only lawsuit that could have been intended by the parties is a lawsuit that this Court authorized. It is undisputed that Naperville Investors LLC did not obtain leave from this Court before pursuing claims against Trigild in Illinois state court. See Record Document 140-15 at 9. Because Naperville Investors LLC did not obtain the requisite leave, the lawsuit clearly did not provide the intended notice. The Court finds that Naperville Investors LLC never put Trigild on notice to cure the alleged title objections, and therefore, the Court rejects Naperville Investors LLC's argument that Trigild failed to deliver clear title.

## ii. **Breach of Implied Duty of Good Faith and Fair Dealing.**

Next, Naperville Investors LLC contends that Trigild defaulted on the PSA and breached its implied duty of good faith and fair dealing by impeding Naperville Investors LLC's financing. See Record Document 140-1 at 26. A duty of good faith and fair dealing is implicit in every contract as a matter of law. See Rsrv. at Woodstock, LLC v. City of Woodstock, 2011 Ill.App.2d 100676, ¶ 42. The obligation of good faith and fair dealing "is essentially used as a construction aid in determining the intent of the parties where an instrument is susceptible of two conflicting

constructions." <u>Resolution Trust Corp. v. Holtzman</u>, 248 Ill.App.3d 105, 112 (1993). The purpose of this duty "is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract." <u>Gore v. Indiana Ins. Co.</u>, 376 Ill.App.3d 282, 286 (2007). "Disputes involving the exercise of good faith arise when one party is given broad discretion in performing its obligations under the contract." <u>Woodstock</u>, 2011 Ill.App.2d 100676, at ¶ 42. "Under this doctrine, a party with contractual discretion must exercise the discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner that is inconsistent with the parties' reasonable expectations." <u>George St. Acquisitions</u>, 2024 Ill.App.2d 230096-U, at ¶ 89 (internal citations omitted).

Naperville Investors LLC contends that it sought financing from a third-party lender. <u>See</u> Record Document 140-1 at 26. Naperville Investors LLC argues that the PSA specifically contemplated that it could seek financing for the purchase, by making multiple references to lenders for Naperville Investors LLC in Section 5.3(b). <u>See</u> Record Document 140-4 at 22. Naperville Investors LLC's lender required it to obtain estoppel certificates[8] from tenants. <u>See</u> Record Document 140-20 at 2. Naperville Investors LLC alleges that "Trigild improperly interfered with Naperville Investor's financing efforts by (1) insisting on controlling the submission and collection process, which served to conceal the tenant's claims and produced only

---

[8] "[T]he estoppel certificates required each tenant to confirm (1) the lease commencement and termination dates; (2) that the landlord has made all required payments and contributions; (3) that neither the tenant nor the landlord were in default under the lease; (4) the amount of the security deposit, base rent, and operating expense/real estate tax contributions; and (5) that the receivables amounts identified by defendant on the aged receivables report were actually due and owing from the tenant." Record Document 140-14 at 9.

one certificate by the week before closing; and (2) refusing to continue closing to allow their collection." Record Document 159 at 8-9.

Naperville Investors LLC relies on Losurdo Brothers v. Arkin Distributing Co., 465 N.E.2d 139 (Ill. App. Ct. 1984) to support its argument that the duty of good faith and fair dealing requires a reasonable period when a contract is silent as to the deadline for accomplishing a particular act. See Losurdo, 465 N.E.2d at 143; see also, Meyer v. Marilyn Miglin, Inc., 652 N.E.2d 1233, 1239 (Ill. App. Ct. 1995) ("[W]hen a time for performance [of a contract] is not specified, a reasonable time will be implied."). In Losurdo, the lease agreement expressly required the lessee to obtain written consent from the lessor before subleasing any part of the premises and further stated that such consent "shall not be unreasonably withheld." Id. at 141. The lessee sent the lessor a request for consent to sublease the property to a third party on December 31, even though the sublease was set to begin the very next day, January 1. See id. at 143. The court concluded that "the lessor must be provided a reasonable period of time to respond, unless a specific time is provided in the lease, and clearly there virtually no time was given for [the lessor] to respond." Id. Therefore, the court found that the lessor did not breach the implied duty of good faith and fair dealing. See id.

In this matter, Trigild argues that estoppels and financing were not conditions to closing. See Record Document 155-9 at 7. Conditions for closing on the PSA are detailed in Sections 4.1[9]

---

[9] Section 4.1 provides,
    [Trigild]'s Condition Precedent to Closing. It shall be a condition precedent to [Trigild]'s obligation to close the transaction discussed herein that:
    (a) [Trigild] shall have received written confirmation from [First Guaranty Bank] that [First Guaranty Bank] approves the sale of the Property pursuant to the terms of this Agreement.
    (b) There is no order from the Receivership Court, or any other court of competent jurisdiction, forbidding [Trigild] to close.
    (c) [Trigild] obtains the Sale Approval Order.
Record Document 140-4 at 19-20.

and 4.8[10]. <u>See</u> Record Document 140-4 at 20-21. The Court agrees neither section mentions any condition to closing based on obtaining estoppels or obtaining financing. <u>See id.</u> Therefore, the court finds <u>Losurdo</u> distinguishable because that lease agreement expressly required the lessee to obtain written consent from the lessor before subleasing any part of the premises whereas there is no express provision in the PSA that mentions the estoppels. Finally, as noted by Trigild, the PSA includes an Extension Option Addendum, which provided an option for the Naperville Investors LLC to extend closing by paying an additional deposit. <u>See</u> Record Document 140-4 at 8-9. In an email, counsel on behalf of Trigild responded to Naperville Investors LLC's concerns about the estoppels being obtained before closing and stated,

> Under the [PSA], [Naperville Investors LLC] has an option whereby closing may be extended. Apparently, [Naperville Investors LLC] does not want to pay what is contractually required to exercise the option. In any event, [Trigild] is ready to close on January 16, and will not agree to an extension request that is not based on anything in the [PSA]. [Naperville Investors LLC]'s vague reference to implied obligations are likewise unavailing. The [PSA] provides the conditions to close, and [Trigild] will follow the [PSA].

Record Document 140-10 at 2. Naperville Investors LLC declined to exercise the option. <u>See</u> Record Document 155-1 at 2-3. The Court finds that the presented evidence does not support a finding that Trigild breached the PSA. Therefore, the Court finds that Naperville Investors LLC did not meet its burden to pursue any breach of the implied duty of good faith and fair dealing claim against Trigild.

---

[10] Section 4.8 provides,
> [Naperville Investors LLC]'s Conditions Precedent to Closing.
> (a) [Trigild] shall have received written confirmation from [First Guaranty Bank] that [First Guaranty Bank] approves the sale of the Property pursuant to the terms of this Agreement.
> (b) There is no order from the Receivership Court, or any other court of competent jurisdiction, forbidding [Trigild] to close.

<u>Id.</u> at 21.

**B.  Recission.**

Alternatively, Naperville Investors LLC argues that it is entitled to recission and the return of its earnest money based on Trigild's (1) failure to disclose numerous material tenant disputes and (2) misrepresentations during the bidding process. See Record Document 140-1 at 28-29. "'[R]escission means the cancelling of a contract so as to restore the parties to their initial status.'" Horwitz v. Sonnenschein Nath & Rosenthal LLP, 399 Ill.App.3d 965, 973 (2010) (quoting Puskar v. Hughes, 179 Ill.App.3d 522, 528, (1989)). A party seeking rescission must be able to "'restore the other party to the status quo existing at the time the contract was made.'" Id. at 974, (quoting Puskar, 179 Ill.App.3d at 528).

**i.  Failure to Disclose Material Tenant Disputes.**

Naperville Investors LLC alleges "Trigild's failure to disclose numerous, substantial disputes with the tenants, including amounts owed as claimed receivables in excess of $671,000, warrants the return of the earnest money on grounds of rescission." Record Document 140-1 at 28. Rescission is an appropriate remedy "where there has been some fraud in the making of a contract, such as an untrue statement or the concealment of a material fact, or where one party enters into a contract reasonably relying on the other party's innocent misrepresentation of a material fact." Ill. State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co., 355 Ill.App.3d 156, 165 (2004). Generally, the party seeking to rescind the contract "must elect to do so promptly after learning of the fraud or misrepresentation, must announce his purpose and must adhere to it." Mollihan v. Stephany, 35 Ill.App.3d 101, 103 (1975). "An unreasonable delay in taking the necessary steps to set aside a fraudulent contract will have the effect of affirming it." Ill. State Bar, 355 Ill.App.3d at 165 (citing White Brass Castings Co. v. Union Metal Mfg. Co., 135 Ill.App.32 (1907)).

Naperville Investors LLC alleges that Trigild made representations that the shopping center was 97% occupied, had stable tenants with triple net leases, and generated $1.45 million in annual net operating income. See Record Document 140-14 at 5. With respect to accounts receivable owed by the tenants, Trigild's "spreadsheet identified total receivables aged 0-30 days in the amount of $91,355.09, total receivables aged 31-60 days in the amount of $55,204.59, total receivables aged 61-90 days in the amount of $49,027.81, and total receivables aged over 90 days in the amount of $529,974.81." Id. at 6. Based on those representations, Naperville Investors LLC estimated its market value and made its bid. See id. at 15-16.

After entering into the PSA and paying the $1,000,000 in earnest money, Naperville Investors LLC discovered that eleven tenants reported that there were substantial disputes with Trigild over the accounts receivable and regarding water damages and repairs to their units. See id. at 10. Five of those tenants allege that they had made their own repairs for water damages that were Trigild's responsibility. See id. Some tenants alleged that they were given credits by the management company, and others reported that Trigild improperly added additional tax and expense reimbursement items that were not recoverable. See id. Naperville Investors LLC alleges that Trigild misrepresented the number of accounts receivable because "most of the accounts receivable totaling in excess of $671,000 as reported by defendant to plaintiff were in dispute." Id. Additionally, Section 2.3(e) of the PSA provides that Trigild receives a credit at closing for all accounts receivable dated 60 days or less from the closing date, and Naperville Investors LLC would acquire all accounts receivable dated 61 days or more from the closing date. See Record Document 140-1 at 13. Therefore, Naperville Investors LLC contends that the disputed accounts receivable impacted the sale and the closing because (1) Trigild would receive a $146,000 credit that Naperville Investors LLC would not recover back from the tenants; and (2) Naperville

Investors LLC would not recover nearly $580,000 in accounts receivable dated more than sixty days. See Record Document 140-1 at 13.

"In determining whether a party justifiably relied on another's representations, courts consider all of the circumstances surrounding the transaction, including the parties' relative knowledge of the facts available, opportunity to investigate the facts and prior business experience." Hassan v. Yusuf, 408 Ill.App.3d 327, 350 (2011). Although reliance is generally not justified where the parties have equal knowledge or means of obtaining knowledge of the misrepresented facts, the plaintiff may justifiably rely where the defendant has created a false sense of security or blocked further inquiry, provided that the facts were not such as to put a reasonable person on inquiry. See Los Amigos Supermarket, Inc. v. Metro. Bank & Trust Co., 306 Ill.App.3d 115, 127-28 (1999). Trigild argues that this argument fails because the PSA contained multiple express disclaimers and "as-is" provisions making clear that Trigild made no representations or warranties whatsoever regarding the Wheatland Naperville Property. See Record Document 155-9 at 8. Trigild asserts that Naperville Investors LLC was required to perform its own diligence and price the transaction accordingly. See id.

Based on the evidence presented, the Court finds that the material discrepancy between Trigild's representations and the subsequent discovery of tenant disputes and the uncertainty of the accounts receivable could potentially undermine the integrity of the transaction. Naperville Investors LLC contends that Trigild obstructed its ability to verify tenant conditions by refusing to allow direct contact with tenants and declining to complete estoppel certificates with known tenant information. See Record Documents 140-10 at 2 and 140-14 at 9. Whether Naperville Investors LLC's reliance was justified under the circumstances is a question of fact. The Court finds that

Naperville Investors LLC has meet its burden to pursue a recission claim against Trigild based on the alleged facts.

ii. **<u>Misrepresentations During the Bidding Process.</u>**

Naperville Investors LLC alleges that Trigild made material misrepresentations during the bidding process that induced Naperville to overpay for the Wheatland Naperville Property. <u>See</u> Record Document 140-1 at 28-29. On November 18, 2024, the Wheatland Naperville Property was listed for auction on Ten X. <u>See</u> Record Document 140-4 at 2. The platform showed the "current bid" and a decreasing "bid increment," which began at $1,000,000 and dropped to $25,000 as bidding progressed. <u>See</u> Record Document 140-5 at 2-4. Naperville Investors LLC bid in $25,000 increments and ultimately won the auction with a bid of $13,675,000 on November 20. <u>See id.</u> Trigild then executed a PSA with Naperville Investors LLC. <u>See</u> Record Document 140-4 at 6-66.

On February 13, 2025, Trigild sought court approval to sell the property to another buyer, Tabani Acquisitions, LLC ("Tabani"), for $12,850,000 because it alleged that Naperville Investors LLC "refused to close." Record Document 137 at 1. Trigild also alleged that Tabani's bid was the "next highest." <u>Id.</u> Naperville Investors LLC contends that statement contradicted the auction platform's representation that Naperville Investors LLC's final bid exceeded the prior one by only $25,000. <u>See</u> Record Document 140-1 at 19. Based on that representation, Naperville Investors LLC further contends it had overbid by more than $1 million. <u>See id.</u> Naperville Investors LLC maintains that these inconsistencies suggest that Trigild misrepresented material information during the auction process. <u>See id.</u>

As previously mentioned, courts evaluating justifiable reliance consider all circumstances surrounding the transaction, including the parties' relative knowledge, opportunity to investigate

the facts, and business experience. See Hassan, 408 Ill.App.3d 327, 350 (2011). Reliance may be justified when the opposing party obstructs further inquiry. See Los Amigos Supermarket, 306 Ill.App.3d at 127-28. Trigild argues that Naperville Investors LLC's principal, Gus Dahleh, is a sophisticated owner and operator of distressed commercial real estate. See Record Document 155-9 at 8. Additionally, Chris Neilson, the managing partner for Trigild, submitted a declaration stating that during the auction, Naperville Investors LLC had the highest bid of $13,675,000, and the next highest bid was $13,650,000. See Record Document 155-1 at 1. Chris Neilson further testified that after Naperville Investors LLC "refused to close on the sale" and "the impact of the auction was lost," the next highest available purchase price was $12,850,000. Id.

The Court finds that Naperville Investors LLC has plausibly alleged that Trigild misled it into overbidding by falsely representing the gap between bids and mischaracterizing the amount of the next highest offer. Even sophisticated parties are entitled to rely on accurate and honest representations in an auction process. See Busey Bank v. Cosman, 616 B.R. 358, 370-71 (Bankr. N.D. Ill. 2020) (holding that creditors are not required to review and verify each representation with incredulity and are generally entitled to rely on representations made unless it would be so unreasonable as not to be actual reliance at all). Naperville Investor LLC's winning bid of $13,948,500 was in response to a next-highest bid that was represented to be $25,000 less than the winning bid submitted by Naperville Investors LLC. See Record Document 140-4 at 4. While the Court acknowledges that the declaration submitted by Chris Neilson, it cannot overlook the million-dollar difference between the bid submitted by Naperville Investor LLC and the bid submitted by Tabani. See Record Documents 137 at 1, 140-4 at 4, and 155-1 at 1. The Court finds that Naperville Investors LLC's recission claim against Trigild regarding Trigild's alleged misrepresentations during the bidding process is not without foundation.

### iii. **Jurisdiction.**

Because Naperville Investors LLC has this Court's authorization to refile the recission claims against Trigild, the Court turns to the parties' arguments regarding jurisdiction. The parties dispute the interpretation of Section 12.1 of the PSA. See Record Documents 140-1 at 11 and 155-9 at 11. Section 12.1 provides,

> In the event of any litigation arising out of or under [the PSA] and/or out of [Naperville Investors LLC]'s ownership, development or construction upon the Property, the prevailing party shall be entitled to collect from the non-prevailing party reasonable attorneys fees and costs. [Trigild] and [Naperville Investors LLC] submit to the jurisdiction of the Receivership Court in respect of any suit or other proceeding brought in connection with or arising out of this [PSA]. The provisions of this Section shall survive the Closing and any termination of this [PSA].

Record Document 140-4 at 30.

"[J]urisdiction, venue, and forum clauses can be mandatory (exclusive) or permissive (nonexclusive)." Kochert v. Adagen Med. Int'l, Inc., 491 F.3d 674, 679 n.2 (7th Cir. 2007). A forum selection clause is mandatory where its "language is obligatory" and "clearly manifests an intent to make venue compulsory and exclusive." Paper Express, Ltd. v. Pfankuch Maschinen GmbH, 972 F.2d 753, 756 (7th Cir.1992). A clause that is merely a party's consent to a court's jurisdiction constitutes a permissive forum selection clause. See IAC/InterActiveCorp v. Roston, 44 F.4th 635, 643 (7th Cir. 2022). A clause that contains mandatory language specifying that disputes under the contract "shall" or "will" be litigated in a specific venue or forum is deemed a mandatory forum selection clause. See, e.g., id. ("[A]ny dispute arising out of or related to the Agreement 'will be heard and determined before an appropriate federal court located in the State of California in Alameda County, or, if not maintainable therein, then in an appropriate California state court located in Alameda County'" was deemed mandatory language); Muzumdar v. Wellness Int'l Network, Ltd., 438 F.3d 759, 762 (7th Cir. 2006) ("Jurisdiction and venue over any disputes arising

out of this agreement shall be proper only in the federal or state courts in Dallas County, Texas" was deemed mandatory language); <u>Paper Express</u>, 972 F.2d at 756 (holding that a clause providing "the parties agree that in any dispute jurisdiction and venue shall be in California" was a mandatory forum selection clause); <u>Piechur v. Redbox Automated Retail, LLC</u>, 2010 WL 706047, at *3 (S.D.Ill. Feb. 24, 2010) ("By agreeing to submit to the 'exclusive jurisdiction' in a particular forum, the parties in this case have manifested their intent to make that venue exclusive and to exclude venue in all other jurisdictions.").

The language found in Section 12.1 of the PSA is interpreted as merely the parties' consent to this Court's jurisdiction. <u>See</u> Record Document 140-4 at 30. The clause does not contain any mandatory language specifying that disputes under the contract "shall" or "will" be litigated in this Court. <u>See id.</u> Therefore, the Court agrees with Naperville Investors LLC's contention that Section 12.1 is non-exclusive. <u>See</u> Record Document 140-1 at 16. Naperville Investors LLC may refile its claims in any court where jurisdiction is proper.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Naperville Investors LLC's "Motion to Authorize State Court Lawsuit" (Record Document 140) is **GRANTED IN PART** and **DENIED IN PART**. Naperville Investors LLC's motion is **DENIED** to the extent that it seeks relief <u>nunc pro tunc</u>. Naperville Investors LLC's motion is **GRANTED** to the extent that it seeks relief to refile the recission claims against Trigild. Naperville Investors LLC's motion is **DENIED** to the extent that it seeks relief to refile the breach of contract claims against Trigild.

An order consistent with the instant Memorandum Ruling shall be issued herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 29th day of July, 2025.

_Donald E Walter_

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE